QUINN EMANUEL URQUHART & SULLIVAN, LLP
DANIEL C. POSNER (Bar No. 232009)
  danposner@quinnemanuel.com
MIKAYLA WASIRI (Bar No. 333890)
  mikaylawasiri@quinnemanuel.com
865 S. Figueroa St., 10th Floor
Los Angeles, CA 90017-2543
Telephone: (213) 443-3000
Facsimile: (213) 443-3100

TODD ANTEN (*pro hac vice* forthcoming)
  toddanten@quinnemanuel.com
295 Fifth Avenue, 9th Floor
New York, NY 10016
Telephone: (212) 849-7000
Facsimile: (212) 849-7100

Attorneys for Plaintiff FOODIELAND LLC

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| FOODIELAND LLC<br><br>    Plaintiff,<br><br>  vs.<br><br>EVENT TICKETS CENTER, INC.,<br><br>    Defendant. | CASE NO. 2:26-cv-7242<br><br>**COMPLAINT FOR:**<br><br>(1)  **FEDERAL TRADEMARK INFRINGEMENT, 15 U.S.C. § 1114**<br>(2)  **FALSE DESIGNATION OF ORIGIN AND UNFAIR COMPETITION, 15 U.S.C. § 1125(a)**<br>(3)  **FALSE ADVERTISING, 15 U.S.C. § 1125(a)**<br>(4)  **INDUCING BREACH OF CONTRACT**<br>(5)  **INTENTIONAL INTERFERENCE WITH** |

COMPLAINT

PROSPECTIVE ECONOMIC RELATIONS

(6) FALSE ADVERTISING, CAL. BUS. & PROF. CODE § 17500 ET SEQ.

(7) UNLAWFUL, UNFAIR, AND FRAUDULENT BUSINESS PRACTICES, CAL. BUS. & PROF. CODE § 17200 ET SEQ.

(8) COMMON LAW TRADEMARK INFRINGEMENT AND UNFAIR COMPETITION

**JURY DEMAND**

COMPLAINT

Plaintiff FoodieLand LLC ("FoodieLand"), by and through its undersigned counsel, brings this action against Defendant Event Tickets Center, Inc. ("ETC"), and alleges, based on its personal knowledge as to its own actions and upon information and belief as to the actions of others, as follows:

**INTRODUCTION**

1. Plaintiff FoodieLand LLC owns and produces FOODIELAND®, a ticketed food and beverage festival that it stages throughout the year at major venues across the United States, including the Rose Bowl Stadium in Pasadena, California, the Del Mar Fairgrounds in Del Mar, California, and the Cow Palace in Daly City, California. Tens of thousands of consumers attend each FOODIELAND® event, drawn by FoodieLand's reputation for delivering food and entertainment at a fair and accessible price. FoodieLand has spent years and substantial resources building the FOODIELAND® brand and the goodwill that consumers associate with it.

2. Defendant Event Tickets Center, Inc. has hijacked that brand for its own profit. ETC has no relationship with FoodieLand, produces no FOODIELAND® events, and has never been authorized by FoodieLand to sell a single FOODIELAND® ticket. Instead, ETC operates a scheme, together with a network of professional ticket brokers, to resell FOODIELAND® tickets at inflated prices under FoodieLand's name.

3. ETC has built what looks, to an ordinary consumer, like a FoodieLand-authorized ticket website. ETC displays the FOODIELAND® mark across its page headings, web address, ticket listings, and paid search advertisements; pairs it with an artificial-intelligence-generated ("AI-generated") image of a FOODIELAND® event that never took place; and warns that inventory is "limited" and that the event is about to sell out, all to pressure consumers into buying tickets at artificially inflated prices before they question the price or the source. ETC's only disclaimer—a fine-print statement that it is a "resale marketplace, not the ticket seller"—appears only after ETC has already instilled that false and misleading belief in the customer.

4.     There is no legitimate reason for any consumer to buy an overpriced ticket to a FOODIELAND® event on ETC's website.  FoodieLand prices general admission tickets at roughly $12 to keep its events accessible, and FOODIELAND® events generally do not sell out.  A genuine consumer has no reason to pay a reseller a large premium for a ticket that remains available from FoodieLand's authorized ticket sellers at a fraction of ETC's price.  ETC is able to perpetuate its scheme only by misleading consumers about its affiliation with FoodieLand and the supposed scarcity of tickets to FOODIELAND® events.

5.     The consequences of ETC's scheme fall on consumers and on FoodieLand.  Because the automated fraud-detection tools used by FoodieLand's authorized ticketing platforms flag and cancel tickets listed for unauthorized resale, a consumer who buys from ETC frequently arrives at a FOODIELAND® event only to be turned away at the gate and forced to buy another ticket to get in, while ETC keeps its markup.  Having believed throughout that the purchase came from FoodieLand, the consumer then blames FoodieLand for the experience ETC created.

6.     ETC does all this knowingly and with intent to deceive consumers.  On information and belief, ETC solicits and vets professional ticket brokers who supply its FOODIELAND® inventory, steers buyers to ETC's listings, and collects a fee on every resale.  None of these activities is a necessary part of reselling a ticket.  ETC has known since at least August 2025 that FoodieLand objects, having received and disregarded FoodieLand's two written demands to stop, and having continued to sell FOODIELAND® tickets and run its FOODIELAND® advertisements with full knowledge that the tickets are subject to being voided.

7.     At bottom, ETC free-rides on a brand it had no hand in building.  Every ticket ETC sells inflates the apparent price of a FOODIELAND® event and deters consumers who would otherwise have purchased face-value tickets from FoodieLand.  ETC's deception of consumers into believing that ETC is an authorized FoodieLand ticket seller, or that FoodieLand itself is the source of the sale, is unlawful and

-2-

COMPLAINT

constitutes unfair competition.  FoodieLand brings this action to stop ETC and to recover for the harm ETC has caused.

## THE PARTIES

8.     Plaintiff FoodieLand LLC is a limited liability company organized and existing under the laws of the State of California, with its principal place of business in Monrovia, California.  FoodieLand produces FOODIELAND® food festivals throughout the United States.

9.     Defendant Event Tickets Center, Inc. is a corporation organized and existing under the laws of the State of Florida, with its principal place of business at 308 West University Avenue, Suite B, Gainesville, Florida 32601.  ETC owns and operates the ticket resale website located at www.eventticketscenter.com, on which it has listed, offered for sale, and sold tickets to FOODIELAND® events.

## JURISDICTION AND VENUE

10.     This action arises under the Lanham Act, 15 U.S.C. §§ 1114 and 1125. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a).

11.     This Court has supplemental jurisdiction over FoodieLand's related state statutory and common law claims pursuant to 28 U.S.C. § 1367(a), because those claims are so related to the federal claims that they form part of the same case or controversy.

12.     This Court has personal jurisdiction over ETC because ETC transacts and solicits business in this State, directs its advertising and ticket sales to consumers in this State, and has committed the unlawful acts complained of herein in this State. Among other things, ETC lists and sells tickets to FOODIELAND® events held in California, runs paid search advertisements that target California consumers searching for FoodieLand, and has caused harm to FoodieLand, which resides in this State, and to consumers who reside in this State.  FoodieLand's claims arise out of and relate to these California-directed activities.

-3-
COMPLAINT

13. Venue is proper in this district under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to FoodieLand's claims occurred in this district and a substantial part of the harm was suffered in this district. FoodieLand resides and maintains its principal place of business in this district, in Monrovia. FoodieLand stages FOODIELAND® events in this district, including at the Rose Bowl Stadium in Pasadena. ETC directs its FOODIELAND®-branded advertisements and ticket sales to consumers in this district, and ETC's conduct causes FoodieLand to suffer reputational harm, lost and deterred sales, and other injury at its principal place of business in this district.

14. ETC has thus established minimum contacts with this State and purposefully availed itself of the privilege of conducting activities in California and in this district, and the exercise of jurisdiction over ETC comports with traditional notions of fair play and substantial justice.

## FACTUAL ALLEGATIONS

### FoodieLand Produces the FOODIELAND® Festival

15. FoodieLand organizes large-scale, ticketed food and beverage festivals. FoodieLand stages FOODIELAND® events throughout the year at major venues across the United States, and FOODIELAND® events regularly draw tens of thousands of attendees over a single event weekend. FOODIELAND® events are family-friendly, food-centered festivals featuring a curated selection of food and beverage vendors, music, and community programming. FoodieLand has built a substantial following and a reputation for delivering a high-quality experience.

16. Affordability is central to the FOODIELAND® brand. FoodieLand prices admission to be accessible, with general admission tickets commonly priced at approximately $12. FoodieLand has earned consumer goodwill and brand loyalty precisely by pairing a premium event experience with a fair price.

17. FOODIELAND® events generally do not sell out. When demand for a particular event runs high, FoodieLand is often able to open additional time slots or otherwise make additional tickets available.

18. FoodieLand sells admission to FOODIELAND® events exclusively through its authorized ticketing channels, which include the Eventbrite platform and venue-specific authorized ticketing systems. FoodieLand has never authorized ETC to list, offer for sale, or sell tickets to any FOODIELAND® event.

**FoodieLand Owns the FoodieLand Marks**

19. FoodieLand owns numerous trademarks registered with the United States Patent and Trademark Office, including those listed in **Table 1** below (the "FoodieLand Registered Marks"). FoodieLand LLC is the registrant and owner of each of the FoodieLand Registered Marks.

| Table 1: Trademark Registrations | |
|---|---|
| **Registration No.** | **Mark** |
| 6038376 (Apr. 21, 2020) | FoodieLand Night Market |
| 6760903 (June 14, 2022) | FOODIELAND NIGHT MARKET |
| 7922572 (Aug. 26, 2025) | FOODIELAND |

20. FoodieLand's federal trademark registrations are valid and subsisting and provide ETC with at least constructive notice of FoodieLand's rights in the marks. True and accurate copies of the registration certificates are attached as **Exhibit A**.

21.    FoodieLand also owns common law rights in the FOODIELAND and FOODIELAND NIGHT MARKET marks by virtue of its extensive and continuous use of the marks in United States commerce since at least as early as 2019.  In addition, FoodieLand has a trademark application currently pending with the United States Patent and Trademark Office for the mark **FOODIE**LAND, listing a date of first use in commerce of February 28, 2019, for which FoodieLand LLC is the applicant and owner (Serial No. 99770693) (the "FoodieLand common law marks," with the FoodieLand Registered Marks, collectively the "FoodieLand Marks").

22.    FoodieLand used each of the FoodieLand Marks, and registered each of the FoodieLand Registered Marks, in interstate commerce before ETC used any of them in connection with its unauthorized conduct.  FoodieLand has used the FoodieLand Marks in connection with FOODIELAND® events held in California and throughout the United States.

23.    FoodieLand has staged FOODIELAND® events at major venues across the United States since at least 2019, drawing tens of thousands of attendees over each event weekend, and has invested substantial sums in advertising and promoting those events under the FoodieLand Marks.  Through this extensive use, promotion, and registration, FoodieLand has built valuable trademark rights and goodwill in the FoodieLand Marks, which now enjoy substantial commercial success and widespread consumer recognition.

24.    The FoodieLand Marks have acquired secondary meaning and are widely recognized by consumers as identifying FoodieLand as the single source of FOODIELAND® events.

25.    The FoodieLand Marks are inherently distinctive or, at a minimum, have acquired distinctiveness, and are entitled to a broad scope of protection.  FoodieLand has the exclusive right to use the FoodieLand Marks in connection with the production, promotion, and ticketing of FOODIELAND® events.

-6-
COMPLAINT

**FoodieLand Prohibits Unauthorized Ticket Resale**

26.    FoodieLand sells admission to FOODIELAND® events exclusively through its authorized ticketing channels, and FoodieLand's Ticket Terms and Conditions (the "Terms") govern every FOODIELAND® ticket.  A true and accurate copy of the Terms is attached as **Exhibit B**.

27.    FoodieLand publicly posts the Terms at www.foodielandnm.com/ticket-terms-and-conditions and requires every purchaser to affirmatively accept the Terms at the point of sale before any transaction can be completed.  The same Terms apply to FOODIELAND® tickets sold through venue-specific authorized ticketing systems.

28.    The Terms expressly prohibit the unauthorized resale and transfer of FOODIELAND® tickets:  "All publicly sold Tickets are intended for use only by the original Authorized Purchaser and their invited guests.  Tickets may not be resold, transferred, or offered for resale . . . without FoodieLand's prior written consent. . . . Tickets obtained from unauthorized sources may be invalid, counterfeit, or void."

29.    The Terms form a binding contract between FoodieLand and every purchaser of a FOODIELAND® event ticket, and the resale prohibition is a material term of that contract.  Each original purchaser affirmatively accepts the Terms at the point of sale, and electronic acceptance is binding.

30.    Consistent with the Terms, FoodieLand's authorized ticketing platforms use automated fraud-detection tools that identify tickets listed for resale outside FoodieLand's authorized channels and automatically cancel and refund the original purchase, in many cases without any further action by FoodieLand.  A ticket flagged as listed for unauthorized resale is rendered invalid and will not grant admission to a FOODIELAND® event.  FoodieLand also enforces the Terms manually.

31.    FoodieLand sells FOODIELAND® tickets at modest prices, generally ranging from approximately $12 to $15 per ticket.  That authorized price is materially lower than the prices at which ETC lists and sells the same tickets.

COMPLAINT

**ETC Sells FOODIELAND® Tickets Without Authorization**

32.    ETC has built what looks, to an ordinary consumer, like a FoodieLand-authorized ticket website.  In fact, ETC has no relationship with FoodieLand and no authority to sell a single FOODIELAND® ticket.  ETC does not produce FOODIELAND® events, and FoodieLand has never authorized ETC to list, offer for sale, or sell tickets to any FOODIELAND® event.

33.    ETC presents itself to the public as a "trusted" marketplace that vets its sellers and stands behind a "100% Buyer Guarantee."  ETC also describes itself as a secondary resale marketplace that does not own or price the tickets on its site, with inventory coming primarily from professional ticket brokers.

34.    ETC's actual conduct does not match that description.  ETC does not simply provide a neutral venue for the resale of genuine FOODIELAND® tickets.  It does far more than passively host other parties' listings.  On information and belief, ETC's inventory of FOODIELAND® tickets comes from professional ticket brokers and other resellers, whom ETC solicits and relies upon as the source of that inventory.

35.    ETC builds and operates the marketplace through which FOODIELAND® tickets are resold, provides the seller accounts and listing tools through which brokers list FOODIELAND® tickets, represents that it vets and background-checks the sellers it enables, and adds a service fee to every transaction so that ETC shares in the proceeds of each resale.  ETC then sells those tickets to its own customers under the FOODIELAND® name, adding to its listings a number of elements that the lawful resale of a genuine ticket does not require and that mislead FoodieLand's customers about the source, price, and availability of FOODIELAND® tickets.

36.    On information and belief, ETC's conduct reflects a coordinated scheme rather than the incidental resale of unwanted tickets.  ETC and the professional ticket brokers that supply its FOODIELAND® inventory act in concert, for their mutual financial benefit, to acquire FOODIELAND® tickets and resell them through ETC's

-8-

COMPLAINT

platform far above FoodieLand's authorized prices. The brokers supply that inventory with ETC's knowledge, encouragement, and substantial assistance, and as part of the same operation.

37. There is no legitimate resale market for FOODIELAND® tickets that could explain ETC's conduct as anything but such a scheme. FOODIELAND® general admission tickets sell for approximately $12, and FOODIELAND® events generally do not sell out, so a genuine fan has no reason to pay a reseller several times that price for a ticket still available from FoodieLand's authorized channels. The only commercially rational reason to acquire FOODIELAND® tickets in volume is to resell them at markups as high as $100 under the FOODIELAND® name, which is what ETC and its sellers do.

38. The way ETC acquires FOODIELAND® tickets for resale fits that scheme rather than an ordinary pattern of consumer resale. FoodieLand's own detection tools have identified FOODIELAND® ticket purchases made through numerous purchasing accounts, automated bots, disposable or internet-based telephone numbers, and disposable or fake email addresses, and have found that a disproportionate share of the tickets later flagged as unauthorized resales were bought from outside the region or State where the FOODIELAND® event is held. On information and belief, those purchases are made by or for the professional sellers that supply ETC's FOODIELAND® inventory by stocking and sourcing tickets in volume for resale.

39. ETC is the dominant channel for unauthorized FOODIELAND® resales. Although FoodieLand has found FOODIELAND® tickets on a small number of other platforms, ETC accounts for more than 90% of the unauthorized FOODIELAND® resale activity FoodieLand has identified. ETC does not treat FOODIELAND® tickets as a neutral, passive marketplace would. ETC bids on the FOODIELAND® mark in paid search, pairs its FOODIELAND® listings with a fabricated image of a FOODIELAND® event, and posts FOODIELAND®-specific scarcity warnings.

-9-
COMPLAINT

40.     ETC and its sellers resell FOODIELAND® tickets through two methods. Under the first, the purported seller has already bought a FOODIELAND® ticket from an authorized channel, accepting the Terms at the point of purchase, and then resells and transfers it to ETC's customer.  Under the second, the purported seller lists a FOODIELAND® ticket it does not yet hold and, only after ETC's customer pays, buys a matching ticket from an authorized channel (surely for face value), again accepting the Terms, before transferring it to ETC's customer.  ETC's own listing and checkout pages confirm this second method, stating that a seller frequently "does not own" the ticket it lists, is "offering to obtain" it, and does not have it "in hand at the moment" the consumer buys.  A screenshot of ETC's checkout language is included as **Figure 1** below.

**Foodieland**

Friday, July 3, 2026 at 3:00 PM
Rose Bowl Stadium - Pasadena in Pasadena, CA, United States of America
Section: **General Admission** | Row: **GA**

Quantity: 2

All prices are in US Dollars ($) except where otherwise noted.

The tickets you receive may be in the specific section listed here or in an equivalent or better location. This listing describes tickets that the seller does not own or may not know the exact location of the seats, but is offering to obtain for you. Once your order is confirmed, we guarantee that you will receive tickets prior to the start of the event for seats that are in an equivalent or better location or you will receive a full refund.

**Note:**
Mobile Entry Tickets. Must have smart device on hand to enter event. Do not print these tickets.

**Figure 1**

41.     Under either method, an original purchaser bound by the Terms resells and transfers a FOODIELAND® ticket through ETC without FoodieLand's consent, in breach of the Terms, and the ticket the consumer receives is subject to cancellation as an unauthorized resale and refusal at the gate.  That ETC's sellers can list FOODIELAND® tickets in volume before holding any, and source them to order,

COMPLAINT

shows that ETC's inventory is the product of a coordinated operation with professional brokers stocking and sourcing listings against anticipated demand, not the byproduct of individual fans reselling tickets they cannot use.

42.    ETC itself creates and controls the content that misleads FoodieLand's customers. Despite ETC's description of itself as a passive marketplace, ETC drafts and places the paid search advertisements that display the FOODIELAND® mark, creates and posts the AI-generated image of a fictitious FOODIELAND® event, authors and deploys the false-scarcity notices on its FOODIELAND® listing pages, controls the page headings, URLs, and descriptive text on those pages, and makes the "guaranteed delivery" and "100% Buyer Guarantee" representations on which it markets the sale.

43.    ETC also controls the manner in which it presents and frames prices on its FOODIELAND® listing and checkout pages, including its omission of any disclosure that the listed price is a substantial markup over FoodieLand's authorized price. That presentation and framing is ETC's own content, regardless of who sets the nominal resale price. ETC is the creator of this content, not a passive conduit for the content of others.

44.    ETC lists, offers for sale, and sells tickets to actual, specific FOODIELAND® events at substantial markups over FoodieLand's authorized prices. ETC does so on www.eventticketscenter.com under the FOODIELAND® name. ETC has resold those $12 general admission tickets for $37, $50, and as much as $100 or more.

45.    For example, ETC listed general admission tickets to FoodieLand's July 3, 2026, event at the Rose Bowl Stadium in Pasadena, California, at approximately $33 or $35 each. For the $33 listing, ETC broke that price down at checkout into a $27.00 subtotal per ticket plus a $5.40 per-ticket service fee, for an order total of $64.80 for two tickets. Those prices are nearly three times FoodieLand's

authorized general admission price for the event.   Screenshots of this listing are included as **Figures 2** and **3** below.



**Figure 2**



**Figure 3**

46.    ETC has listed, offered for sale, or sold tickets to numerous other FOODIELAND® events as well, including, on information and belief, FOODIELAND® events in San Jose, California; Del Mar, California; and Daly City, California.

47.    ETC displays the FOODIELAND® mark throughout its FOODIELAND® listing pages, including in the page headings, in the page URLs, and in the ticket listings themselves, and places it in the very text of the paid search advertisements that consumers read, with headlines such as "Foodieland 2026 Tickets" and headlines incorporating the event city, for example, "FoodieLand San Jose Tickets."  This is not the mere purchase of a hidden search keyword.  ETC bids on the FOODIELAND® mark and confusingly similar terms so that its listings appear ahead of FoodieLand's own authorized ticketing channels in search results.  That conduct is likely to cause, and does cause, consumers to believe that ETC is an official

COMPLAINT

or authorized FoodieLand ticketing channel and that they are purchasing from an authorized source. On information and belief, ETC has run numerous such advertisements across Google, Bing, and other platforms over an extended period.

48. ETC pairs its display of the FOODIELAND® mark with an AI-generated image that depicts a fictitious FOODIELAND® event. The image is fabricated, not a photograph of any actual FOODIELAND® event, and FoodieLand did not create, authorize, or approve the image. The image itself bears an AI-generation watermark in its bottom right corner. ETC's pairing of the mark with this fabricated event image goes beyond using the FOODIELAND® name to identify the events to which the listed tickets relate, and instead holds ETC out as an official or authorized FoodieLand source, completing the impression that consumers are dealing with an official FoodieLand channel. The fabricated image also independently misrepresents the nature, characteristics, and appearance of FOODIELAND® events. A screenshot of this image is included as **Figure 4** below.



**Figure 4**

COMPLAINT

49.   ETC also manufactures urgency that does not exist.  ETC deploys pop-up notices and labels on its FOODIELAND® listing pages that warn consumers of scarcity and pressure them to buy immediately, including a "High Demand Event" label, statements that "Inventory is limited" coupled with an instruction to "Secure your tickets before they are sold by ordering now," and countdown timers conveying that the opportunity to purchase is expiring.

50.   These scarcity warnings are false or misleading.  FOODIELAND® events generally do not sell out, and when demand for a particular event runs high, FoodieLand can often open additional time slots or otherwise make additional tickets available.  Even if the inventory available through ETC's own platform is limited at a given moment, ETC's notices convey the false and misleading impression that FOODIELAND® tickets are broadly scarce and that the event itself is about to sell out when, in fact, FOODIELAND® tickets remain available from FoodieLand's authorized channels.  ETC's false and misleading urgency tactics are designed to, and do, pressure consumers into purchasing FOODIELAND® tickets at inflated prices before they pause to question the price or the source.  Screenshots of ETC's scarcity warnings are included as **Figures 5 and 6** below.



**Figure 5**

-15-



**Figure 6**

51.  ETC's fine-print disclaimer does not dispel the confusion ETC creates. ETC states, in small type on its listing pages, that it is "a resale marketplace, not the ticket seller," and that "[p]rices are set by third-party sellers and may be above or below face value." That statement is inadequate. It is inconspicuous and is dwarfed by ETC's prominent display of the FOODIELAND® mark, the fabricated FOODIELAND® event image, and the FOODIELAND®-branded advertisements and headings that surround it. The consumer encounters it, if at all, only after the FOODIELAND®-branded advertisement has drawn the consumer to the page, the mark and event image have created the impression of an official source, and the "limited inventory" and countdown pressure have urged an immediate purchase. It also never discloses that ETC's price is a substantial markup over FoodieLand's approximately $12 authorized price, that the consumer is not buying from an authorized FoodieLand source, or that the resold ticket is subject to automatic cancellation as an unauthorized resale and to refusal at the gate.

52.  Each of ETC's representations concerning source, affiliation, price, and scarcity is material to consumers' purchasing decisions.

53.  ETC's use of the FoodieLand Marks goes well beyond mere referential use. ETC reproduces the FoodieLand Marks, displays them prominently and repeatedly in its paid search headlines, in the headings and text of its listing pages, and in the URLs and page titles for those listings, and pairs the marks with a fabricated image of a FOODIELAND® event. ETC's use of the FoodieLand Marks improperly

suggests to consumers that its services are sponsored by, endorsed by, or affiliated with FoodieLand. In addition, ETC displays the fabricated image as though it depicts an actual FOODIELAND® event and posts official-looking (but incorrect) scarcity and demand notices on its FOODIELAND® listing pages.

<u>**ETC Deceives Consumers and Harms FoodieLand**</u>

54.    Consumers who reach ETC's site reasonably believe they are buying from an official or authorized FoodieLand channel. ETC's use of the FoodieLand Marks, the fabricated image of a FOODIELAND® event, the FOODIELAND®-branded advertisements, and the FOODIELAND®-branded listing pages is likely to cause, and has caused, confusion, mistake, and deception as to the source, sponsorship, affiliation, or endorsement of ETC and its FOODIELAND® ticket listings. That confusion cuts across the consuming public, is not limited to any demographic, and leaves many consumers unaware that ETC is a resale site at all.

55.    ETC's conduct also distorts the price information consumers see about FoodieLand. When consumers search for FoodieLand, ETC's resale listings appear prominently, and automated search results and generative artificial-intelligence summaries identify ETC as a primary source for FoodieLand tickets. These results present misleading pricing, including a price range whose upper bound is more than four times the actual price of a ticket. This further misleads consumers as to FoodieLand's actual ticket prices and damages the FOODIELAND® brand. A screenshot of an example search summary is included below as **Figure 7**.

-17-
COMPLAINT



**Figure 7**

56.    On or about August 21, 2025, a consumer publicly posted a side-by-side price comparison on social media, displaying FoodieLand's authorized price of approximately $12 for a FOODIELAND® event in Portland, Oregon, shown on the authorized venue's own ticket page, next to a screenshot of ETC's listing of the same event at approximately $50 per ticket.[1]  The consumer called the pricing a "scam" and explained that she would not have known FoodieLand's actual price had she not checked it herself.  The post reflects both the price confusion that ETC's listings create and the reputational harm to the FOODIELAND® brand, and because it predates FoodieLand's August 29, 2025, takedown notice, it confirms that ETC's conduct was deceiving and deterring consumers even before FoodieLand first demanded that ETC stop.  Screenshots of the social media post are included below as **Figures 8** and **9**.

---

[1]  https://www.tiktok.com/@roflkitten/photo/7541064792555965727

COMPLAINT



**Figure 8**



**Figure 9**

57.  Consumers who buy FOODIELAND® tickets through ETC are frequently turned away at the gate.  Because the automated fraud-detection tools used by FoodieLand's authorized ticketing platforms flag and cancel tickets listed for unauthorized resale, FOODIELAND® tickets purchased through ETC are frequently rendered invalid and will not grant admission, and the affected consumer must repurchase tickets to gain entry.

58.  FoodieLand has already logged hundreds of affected consumers at a single event.  At a FOODIELAND® event in San Francisco over one weekend,

FoodieLand logged more than six hundred consumers affected by resold tickets. At another recent event, FoodieLand's ticketing personnel estimated that at least three hundred guests were affected over the weekend. In connection with an event in the San Diego area, detection tools flagged more than eight hundred tickets that had been resold without authorization. The automated cancellations alone have voided hundreds of resold FOODIELAND® tickets at a single event.

59. FoodieLand has no control over ETC's listings, pricing, advertisements, imagery, or representations, yet it is FoodieLand that consumers blame for the experience ETC creates.

60. ETC's conduct has caused, and continues to cause, FoodieLand substantial and irreparable injury. The core of that injury is harm to FoodieLand's reputation, goodwill, and customer relationships. By presenting inflated resale prices as though they were the price of admission to a FOODIELAND® event, ETC deters consumers from purchasing FOODIELAND® tickets at all, a sale FoodieLand never recovers. ETC also diverts consumers who would otherwise purchase through FoodieLand's authorized channels into ETC's resale chain, including where ETC sells speculatively, so that FoodieLand may never make the original authorized retail sale. When an ETC-purchased ticket is voided and the consumer is turned away, the consumer blames FoodieLand, inflicting reputational harm whether or not the consumer ultimately repurchases.

### ETC Acts Knowingly and Willfully

61. ETC has been on notice of the Terms and resale prohibition since at least August 29, 2025, by which date it had already listed FOODIELAND® tickets. ETC received actual notice of FoodieLand's objection to its conduct on August 29, 2025, and has pressed forward anyway.

62. On August 29, 2025, FoodieLand sent ETC a written takedown notice (**Exhibit C**) addressed to ETC's compliance team. The notice identified FoodieLand's published Ticket Terms and Conditions, stated that FOODIELAND®

tickets are non-transferable and may not be resold, and demanded that ETC remove all current and future FOODIELAND® listings and confirm removal in writing. ETC did not respond and did not stop.

63. On May 20, 2026, FoodieLand's counsel sent ETC's CEO, Adam M. Young, a detailed demand letter (**Exhibit D**) that identified ETC's unauthorized conduct, the FoodieLand Marks, and the Terms, and demanded that ETC cease listing and selling FOODIELAND® tickets, cease using the FoodieLand Marks and the fabricated event image, cease bidding on the FOODIELAND® mark, and provide an accounting of its advertisements. ETC has not responded.

64. ETC is, by its own description, a sophisticated commercial resale marketplace whose inventory comes primarily from professional ticket brokers. It thus understood the resale restrictions on the tickets it sells, and FoodieLand in any event expressly notified it of the Terms. ETC has nonetheless continued, and its conduct has been and remains knowing, willful, intentional, and in bad faith.

### FIRST CAUSE OF ACTION

**(Federal Trademark Infringement, 15 U.S.C. § 1114)**

65. FoodieLand repeats and realleges each and every allegation contained in the preceding paragraphs as if set forth herein in full.

66. FoodieLand owns valid and subsisting United States federal trademark registrations for the FoodieLand Marks, including the registrations identified in **Table 1**, and has continuously used the FoodieLand Marks in commerce throughout the United States.

67. ETC uses the FoodieLand Registered Marks in commerce, without FoodieLand's consent, to advertise, offer for sale, and sell tickets that ETC has no authority to sell, including by displaying the FOODIELAND® mark in page headings, URLs, and ticket listings, by using the FOODIELAND® mark in the text of its paid search advertisements, and by pairing those displays with a fabricated image of a FOODIELAND® event.

-21-
COMPLAINT

68.    ETC's use of the FoodieLand Marks does more than identify the FOODIELAND® events to which the listed tickets relate.  By pairing the FoodieLand Marks with a fabricated image of a FOODIELAND® event, deploying the marks in FOODIELAND®-branded advertisements and page headings positioned ahead of FoodieLand's authorized channels, and surrounding the marks with representations that ETC is a "trusted" source standing behind a guarantee, ETC suggests that it is an official or authorized FoodieLand ticketing channel and that FoodieLand sponsors, endorses, or is affiliated with ETC.

69.    ETC's use of the FoodieLand Marks is likely to cause confusion, to cause mistake, or to deceive consumers as to the source, sponsorship, affiliation, or endorsement of ETC and its FOODIELAND® ticket listings, and falsely suggests that ETC is an official or authorized FoodieLand ticketing channel.

70.    ETC's use of the FoodieLand Marks is likely to cause, and has caused, actual confusion among consumers, as alleged above.

71.    FoodieLand's claim under Section 1114 is based on ETC's use of FoodieLand's federally registered marks and reaches ETC's conduct from the respective registration dates of those marks forward, which encompasses all the conduct documented in this Complaint, including ETC's 2026 FOODIELAND® listings and advertisements.

72.    ETC's infringement of the FoodieLand Marks has been and continues to be willful, intentional, and in bad faith, and has continued after FoodieLand notified ETC of its rights.   ETC's willful and bad-faith infringement renders this an exceptional case within the meaning of 15 U.S.C. § 1117(a).

73.    ETC has profited from its infringement, and FoodieLand has been damaged.

74.    ETC's conduct violates 15 U.S.C. § 1114.  FoodieLand is entitled to injunctive relief, to ETC's profits, to FoodieLand's actual damages, to enhanced and

-22-

COMPLAINT

treble damages, and to costs and reasonable attorneys' fees pursuant to 15 U.S.C. §§ 1116 and 1117.

75. ETC has caused, and unless enjoined will continue to cause, irreparable injury to FoodieLand that is not fully compensable in monetary damages, including harm to the goodwill and reputation symbolized by the FoodieLand Marks.

76. FoodieLand is therefore entitled to a preliminary and permanent injunction enjoining ETC, and all persons acting in concert or participation with it, from any use of the FoodieLand Marks, or any mark confusingly similar thereto, in connection with the advertising, offering for sale, or sale of any tickets.

## SECOND CAUSE OF ACTION

**(False Designation of Origin and Unfair Competition, 15 U.S.C. § 1125(a))**

77. FoodieLand repeats and realleges each and every allegation contained in the preceding paragraphs as if set forth herein in full.

78. FoodieLand owns valid trademark rights, including common law rights dating to at least 2019, in the FoodieLand Marks, which are superior to any rights ETC may claim and which reach the entire period of ETC's conduct, including any conduct predating the registration of the FOODIELAND word mark.

79. ETC's unauthorized use of the FoodieLand Marks in interstate commerce, including in page headings, URLs, ticket listings, paid search advertisements, and in connection with the fabricated image of a FOODIELAND® event, constitutes a false designation of origin and a false or misleading representation of fact.

80. ETC's use of the FoodieLand Marks suggests an affiliation with, and sponsorship, endorsement, or approval by, FoodieLand, by pairing the marks with a fabricated FOODIELAND® event image and presenting ETC as an official or authorized FoodieLand source, rather than merely identifying the events to which the listed tickets relate.

-23-
COMPLAINT

81. ETC's conduct is likely to cause, and has caused, confusion, mistake, or deception as to the affiliation, connection, or association of ETC with FoodieLand, and as to the origin, sponsorship, or approval of ETC's goods, services, or commercial activities by FoodieLand, in violation of 15 U.S.C. § 1125(a).

82. Consumers reasonably believe that ETC is an official or authorized FoodieLand ticketing channel, and ETC's conduct trades on FoodieLand's reputation and goodwill.

83. ETC's conduct has been and continues to be willful, intentional, and in bad faith, and ETC has profited from it while FoodieLand has been damaged. ETC's willful and bad-faith conduct renders this an exceptional case within the meaning of 15 U.S.C. § 1117(a).

84. ETC has caused, and unless enjoined will continue to cause, irreparable injury to FoodieLand that is not fully compensable in monetary damages.

85. FoodieLand is entitled to injunctive relief, to disgorgement of ETC's profits, to actual damages, to enhanced damages, and to costs and reasonable attorneys' fees pursuant to 15 U.S.C. §§ 1125(a) and 1117.

## THIRD CAUSE OF ACTION
### (False Advertising, 15 U.S.C. § 1125(a))

86. FoodieLand repeats and realleges each and every allegation contained in the preceding paragraphs as if set forth herein in full.

87. In commercial advertising and promotion, ETC has made false or misleading representations of fact concerning the nature, characteristics, and qualities of its FOODIELAND® ticket listings and of FOODIELAND® events. Each of the representations is ETC's own statement, drafted, made, and disseminated by ETC, and not merely a third party's listing.

88. ETC's false or misleading representations include, without limitation, the following affirmative representations and misleading omissions: (a) ETC affirmatively represents, through "High Demand Event" labels, "Inventory is limited"

-24-

COMPLAINT

notices, instructions to "[s]ecure your tickets before they are sold by ordering now," and countdown timers, that FOODIELAND® tickets are scarce and that FOODIELAND® events are in danger of selling out, when in fact FOODIELAND® events generally do not sell out and no such scarcity exists; (b) ETC affirmatively represents, through its use of the FoodieLand Marks in its advertising and on its listing pages and through the fabricated image of a FOODIELAND® event, that ETC is an official or authorized FoodieLand source; (c) ETC affirmatively represents that the FOODIELAND® tickets it sells are "guaranteed" to be delivered in time for the event and valid for entry, when ETC and its sellers frequently do not hold those tickets at the time of sale and when the tickets ETC sells are subject to being voided as unauthorized resales and refused at the gate; (d) ETC presents its reseller markups as though they were the price of admission to a FOODIELAND® event, without adequate or conspicuous disclosure that the listed price is a markup of several hundred percent over FoodieLand's authorized price.  ETC's fine-print "resale marketplace" statement does not cure this misrepresentation, for the reasons alleged above, including that the statement is inconspicuous, is dwarfed by ETC's prominent FOODIELAND® branding, appears only after the affiliation impression and purchase urgency have taken hold, and does not disclose the markup or the risk that the ticket will be voided; and (e) ETC affirmatively represents, through the AI-generated and fabricated image of a FOODIELAND® event displayed on its FOODIELAND® listing pages, that FOODIELAND® events have the nature, characteristics, qualities, and appearance that the image depicts, when in fact the image is fabricated, depicts no actual FOODIELAND® event, and misrepresents what FOODIELAND® events are and how they look.

89.    ETC's representations are material to consumers' purchasing decisions and are likely to influence those decisions.

90.    ETC's representations actually deceive, or have the tendency to deceive, a substantial segment of their intended audience.

91. ETC's false advertising occurs in interstate commerce.

92. ETC's false advertising has caused, and is likely to continue to cause, commercial injury to FoodieLand, including deterred and diverted sales and harm to FoodieLand's reputation and goodwill.

93. ETC's conduct violates 15 U.S.C. § 1125(a). FoodieLand is entitled to injunctive relief, to disgorgement of ETC's profits, to actual damages, to enhanced damages, and to costs and reasonable attorneys' fees pursuant to 15 U.S.C. §§ 1125(a) and 1117.

## FOURTH CAUSE OF ACTION

### (Inducing Breach of Contract)

94. FoodieLand repeats and realleges each and every allegation contained in the preceding paragraphs as if set forth herein in full.

95. A valid and binding contract exists between FoodieLand and each original purchaser of a FOODIELAND® ticket, namely the Terms, which prohibit the unauthorized resale and transfer of FOODIELAND® tickets.

96. ETC knew of those contracts and of the resale prohibition, as alleged above. In any event, ETC has had actual knowledge of those contracts and the resale prohibition since at least August 29, 2025.

97. ETC intended to induce, and did induce, holders of FOODIELAND® tickets to breach the Terms by reselling their FOODIELAND® tickets through ETC's platform, and ETC then sold the resulting tickets to its own customers at substantial markups. ETC does so actively, and not by merely providing a neutral venue. Among other things, ETC solicits and relies on professional ticket brokers as the primary source of its FOODIELAND® inventory, provides the seller accounts and listing tools through which those brokers list FOODIELAND® tickets, represents that it vets and background-checks the sellers it enables, drives buyer demand to the resale listings through the FOODIELAND®-branded advertisements, imagery, and urgency tactics that ETC itself creates, and takes a fee on every resale.

98. The sellers who supply and fulfill FOODIELAND® listings on ETC's platform breach the Terms. Every FOODIELAND® ticket that ETC delivers is purchased from FoodieLand's authorized channels by a buyer who affirmatively accepted the Terms, including the resale prohibition, at the point of purchase. Where the seller holds the ticket before listing it, the seller breaches the Terms by reselling and transferring that ticket through ETC without FoodieLand's consent. Where the seller lists the ticket before acquiring it and then buys a matching ticket to fill the order, the seller becomes bound by the Terms when it makes that purchase and breaches them when it transfers the ticket to ETC's customer. In either case, a purchaser bound by the Terms resells and transfers a FOODIELAND® ticket originally bought from an authorized channel without FoodieLand's consent, and the seller's act of offering the ticket for resale through ETC independently violates the Terms' prohibition on offering tickets for resale.

99. FoodieLand has been harmed as a result of the breaches ETC induced, and ETC's conduct was a substantial factor in causing that harm.

100. ETC's conduct was willful, malicious, and in conscious disregard of FoodieLand's rights, entitling FoodieLand to punitive and exemplary damages under California Civil Code § 3294.

### FIFTH CAUSE OF ACTION

### (Intentional Interference with Prospective Economic Relations)

101. FoodieLand repeats and realleges each and every allegation contained in the preceding paragraphs as if set forth herein in full.

102. FoodieLand has existing economic relationships with identifiable prospective purchasers of FOODIELAND® tickets, each of which probably would result in ticket purchases and an economic benefit to FoodieLand. These identifiable relationships include, among others, FoodieLand's relationships with (i) consumers who have begun the purchase process for specific, dated FOODIELAND® events through FoodieLand's authorized channels, including consumers who selected

-27-
COMPLAINT

tickets, created a cart, or entered checkout for a particular FOODIELAND® event before being diverted by ETC's FOODIELAND®-branded advertising; (ii) consumers who have registered with or created accounts through FoodieLand's authorized ticketing channels; and (iii) consumers who have provided their contact information by subscribing to FoodieLand's email and text-message marketing.  Each of these is an identifiable group of specific, existing customers, and not the consuming public at large.

103.   ETC knew of these economic relationships.  FoodieLand's established customer base, following, and recurring events are known to ETC, and ETC targets the same consumers through its FOODIELAND®-branded search advertising, which is calculated to intercept consumers who are searching for FoodieLand and seeking to purchase FOODIELAND® tickets.

104.   ETC engaged in wrongful conduct, independent of the interference itself, including trademark infringement and false designation of origin under the Lanham Act, false advertising under federal and California law, and the inducement of breach of FoodieLand's ticket contracts, as alleged above.

105.   By engaging in that conduct, ETC intended to disrupt FoodieLand's prospective economic relationships with these identifiable prospective purchasers, or knew that disruption was certain or substantially certain to occur, by diverting these prospective purchasers to ETC, deterring them from purchasing through FoodieLand's authorized channels, and causing them to forgo purchasing FOODIELAND® tickets at all.

106.   FoodieLand's prospective economic relationships were disrupted, and FoodieLand was harmed, as a result of ETC's conduct, which was a substantial factor in causing that harm.

107.   ETC's conduct was willful, malicious, and in conscious disregard of FoodieLand's rights, entitling FoodieLand to punitive and exemplary damages under California Civil Code § 3294.

COMPLAINT

## SIXTH CAUSE OF ACTION

### (False Advertising, Cal. Bus. & Prof. Code § 17500 et seq.)

108.   FoodieLand repeats and realleges each and every allegation contained in the preceding paragraphs as if set forth herein in full.

109.   With the intent to dispose of personal property and to induce the public to enter into obligations relating thereto, ETC made and disseminated, and caused to be made and disseminated, before the public in California and from California, statements concerning its FOODIELAND® ticket listings and FOODIELAND® events that are untrue or misleading.

110.   ETC's untrue or misleading statements include, without limitation, the affirmative representations of source, affiliation, price, scarcity, and guaranteed delivery and validity described above, together with ETC's failure to adequately disclose that its prices are reseller markups and that resold tickets may be voided. Each of these statements is ETC's own statement, made and disseminated by ETC through the FOODIELAND®-branded advertisements, the fabricated event image, the urgency pop-ups, and the representations on its listing and checkout pages that ETC drafts and controls, and not merely a third party's listing.

111.   ETC knew, or by the exercise of reasonable care should have known, that these statements were untrue or misleading.

112.   ETC disseminated these statements through the internet and other means.

113.   ETC's conduct violates California Business and Professions Code § 17500 et seq.

114.   FoodieLand has suffered injury in fact and lost money or property as a result of ETC's conduct, and is entitled to injunctive relief, any restitution available under California law, and such other relief as the Court deems proper.

-29-

COMPLAINT

## SEVENTH CAUSE OF ACTION

### (Unlawful, Unfair, and Fraudulent Business Practices,

### Cal. Bus. & Prof. Code § 17200 et seq.)

115. FoodieLand repeats and realleges each and every allegation contained in the preceding paragraphs as if set forth herein in full.

116. ETC has engaged in unlawful, unfair, and fraudulent business acts and practices in violation of California Business and Professions Code § 17200 et seq. This claim rests on ETC's own conduct and on the content that ETC itself creates and controls, including its FOODIELAND®-branded advertisements, the fabricated FOODIELAND® event image, its false-scarcity pop-ups and labels, its representations of guaranteed delivery and validity, and its active operation of and supply to the resale marketplace described above.

117. ETC's practices are unlawful because they violate, among other laws, the Lanham Act, 15 U.S.C. §§ 1114 and 1125(a), California Business and Professions Code § 17500 et seq., and the common law, as alleged above.

118. ETC's practices are unfair because the harm they cause to FoodieLand and to consumers far outweighs any utility of the conduct. ETC's conduct turns away paying consumers at the gate, forces them to buy a second ticket, results in the voiding of tickets they bought in good faith, presents inflated resale prices as the price of admission so that consumers forgo the event, and trades on the FOODIELAND® name through a fabricated event image, none of which serves any business interest that the resale of a genuine ticket requires. The conduct also violates the public policy embodied in FoodieLand's resale restrictions and in the consumer-protection and trademark laws identified above.

119. ETC's practices are fraudulent because they are likely to deceive members of the public as to the source, affiliation, price, and availability of FOODIELAND® tickets, as alleged above.

-30-

COMPLAINT

120.  ETC's conduct includes the targeted bidding on FoodieLand-branded keywords to position ETC ahead of FoodieLand's authorized channels, the diversion of consumers to a site displaying the FoodieLand Marks and a fabricated image of a FOODIELAND® event, the inducement of breaches of FoodieLand's ticket contracts, and the use of pressure tactics misrepresenting inventory and price.

121.  FoodieLand has suffered injury in fact and lost money or property as a result of ETC's conduct.

122.  FoodieLand is entitled to injunctive relief, any restitution available under California law, and such other relief as the Court deems proper.

**EIGHTH CAUSE OF ACTION**

**(Common Law Trademark Infringement and Unfair Competition)**

123.  FoodieLand repeats and realleges each and every allegation contained in the preceding paragraphs as if set forth herein in full.

124.  ETC's conduct, including its unauthorized use of the FoodieLand Marks, its false designation of origin, its false advertising, and its misappropriation of FoodieLand's reputation and goodwill, constitutes trademark infringement and unfair competition under the common law of California and other states.  This claim rests on ETC's own conduct, including ETC's holding itself out as an official or authorized FoodieLand ticketing channel through the FOODIELAND®-branded advertisements, page headings, and fabricated event image that ETC itself creates and controls.

125.  ETC's conduct is likely to cause, and has caused, confusion, mistake, and deception, as well as injury to FoodieLand's goodwill and reputation.

126.  ETC's conduct demonstrates an intentional, willful, and malicious intent to trade on the goodwill associated with the FoodieLand Marks and the FOODIELAND® brand.

127.  FoodieLand has been harmed as a result of ETC's conduct and has no adequate remedy at law.

-31-
COMPLAINT

128. FoodieLand is entitled to injunctive relief, an accounting and disgorgement of ETC's profits, actual damages, and, because ETC's conduct has been wanton, deliberate, malicious, and willful, punitive damages under California Civil Code § 3294.

## RELIEF SOUGHT

WHEREFORE, Plaintiff hereby requests that this Court order as follows:

a. An order enjoining and restraining ETC, its officers, members, directors, agents, servants, employees, successors, licensees, representatives, assigns, and all persons acting in concert or participation with them, from:

(i) Listing, offering for sale, or selling tickets to any FOODIELAND® event on www.eventticketscenter.com or any other channel under ETC's ownership or control, irrespective of which platform originally issued the underlying ticket;

(ii) Using or displaying the FoodieLand Marks, or any name, designation, or depiction substantially or confusingly similar thereto, including the AI-generated image of a fictitious FOODIELAND® event, in connection with the advertising, offering for sale, or sale of any tickets;

(iii) Using the FOODIELAND® mark, or any confusingly similar variation, in the visible text, headline, or other display of any paid search advertisement on Google, Bing, or any other platform, and bidding on the FOODIELAND® mark, or any confusingly similar variation, in a manner that causes the mark to appear in the visible text or headline of any such advertisement;

(iv) Making any false or misleading representation as to the source, affiliation, sponsorship, price, or availability of FOODIELAND® tickets, including any representation of false scarcity or urgency; and

(v) Otherwise competing unfairly with FoodieLand or infringing the FoodieLand Marks;

-32-
COMPLAINT

b.     An order directing ETC to provide a written account identifying the number, content, and placement of all advertisements, including paid search advertisements, that have used the FoodieLand Marks or depicted any image purporting to show a FOODIELAND® event;

c.     An order directing ETC to file with the Court and serve on FoodieLand, within thirty (30) days after entry of an injunction, a report in writing and under oath setting forth in detail the manner and form in which ETC has complied with the injunction;

d.     An accounting and disgorgement of ETC's profits arising from the conduct complained of herein, as provided under 15 U.S.C. § 1117 and the common law;

e.     An award of FoodieLand's actual damages and lost profits;

f.     An award of enhanced and treble damages pursuant to 15 U.S.C. § 1117;

g.     An award of punitive and exemplary damages as available by law, including under California Civil Code § 3294;

h.     An order directing ETC to pay the costs of corrective advertising;

i.     An award of FoodieLand's reasonable attorneys' fees and costs incurred in this action as available by law, including under 15 U.S.C. § 1117;

j.     An award of pre-judgment and post-judgment interest; and

k.     Such other and further relief as the Court may deem just and proper.

-33-
COMPLAINT

**DEMAND FOR JURY TRIAL**

Plaintiff respectfully requests a jury trial on all issues triable thereby.

DATED:  July 2, 2026                    QUINN EMANUEL URQUHART &
                                        SULLIVAN, LLP


By _____ */s/ Daniel C. Posner* _____
      DANIEL C. POSNER (Bar No. 232009)
      danposner@quinnemanuel.com
      MIKAYLA WASIRI (Bar No. 333890)
      mikaylawasiri@quinnemanuel.com
      865 S. Figueroa St., 10th Floor
      Los Angeles, CA 90017-2543
      Telephone: (213) 443-3000
      Facsimile: (213) 443-3100

      TODD ANTEN (*pro hac vice* forthcoming)
      toddanten@quinnemanuel.com
      295 Fifth Avenue, 9th Floor
      New York, NY 10016
      Telephone: (212) 849-7000
      Facsimile: (212) 849-7100

      Attorneys for Plaintiff Foodieland LLC

COMPLAINT